The first case for argument this morning is 15-1344 Catfish Farmers of America v. United States. Mr. McConkie. May it please the court. My name is Matthew McConkie from the law firm of Mayor Brown, and I am here today on behalf of Appellant Vinh Hoan Corporation. So this is an appeal related to an anti-dumping case, specifically the sixth administrative review of the order against certain fish fillets from Vietnam, a country deemed to be a non-market economy by the Department of Commerce. As such, the issues that we're presenting today all relate to various surrogate values that were used to calculate dumping margins for my client. The surrogate values being contested are just... What is fish waste good for? Lots of different things. People make collagen out of it, and often many different Asian places they use it for soups and for cooking. It's a delicacy. Fish bladders and things like that can be considered a fish... A delicacy in certain other countries. So the two values being contested today are first the fish byproducts, which are values that are used to reduce one's normal value in the dumping calculation. And the second is surrogate financial ratios, values that are used to build up one's normal value. So I understand and I trust that the panel has read the briefs in this case. So what's the standard of review here? No, but from the CIT. Question of law? Question of law. Correct. But I'd like to give a little short summary of the proceedings because I think it's important. So March of 2011, the final administrative decision was issued in this review, and my client was deemed not to be dumping. So with respect to the issues that are relevant to this appeal, the department, after considering the facts on the record and the arguments set for an underlying administrative case briefs, the department made two underlying administrative decisions that are impacted here. First, they decided to value my client's byproducts using import statistics. I want to go back to the standard of review. We go right through. While respecting the CIT's decision, we look through it and review Commerce's decision, right? Yes. And why isn't that the substantial evidence? It is.  I apologize. Substantial evidence. Thank you. That's what the CIT looks, and you do look at it yourself. I apologize. So in that administrative process, in the administrative final decision, the department used import data to value my client's byproducts, and for our surrogate financial ratios, they used the financial statement of an integrated company, a Bangladesh seafood company called Fine Foods, and they did not ingest the inventory movements when they calculated those ratios. Again, the decision was that my client was not dumping, okay? Now, so you understand, in the process, there were two mandatory respondents in this case, an integrated company, which was Vinh Hoang, my client, and a non-integrated company. The department looked at and used different financial statements for those two sets of companies. They used non-integrated financial statements, two of them, for this company that was non-integrated, and then Fine Foods, which is an integrated company, for my client. Are you telling us, Susie, that their choice was bound to reach the wrong result, or that it simply was not the right choice in comparison? It was not the right choice, and the key thing, I think, with this issue of financial ratios is, in the administrative decision, the department made the right choice, and in its initial reaction to a ministerial errors letter filed by petitioners in this case, the department, again, supported its choice and said, yes, we're going to use Fine Foods, but no, we're not going to adjust the inventory because we meant to do this. This happens not infrequently in these cases where the CIT sends it back to Commerce and Commerce does a do-over. I understand. And it reevaluates the evidence and looks at them in different ways. So that's where you're left. So you want to call out what is really the highlight, since we all agree what the standard of review is, the highlights of where Commerce went wrong. It's kind of very difficult for us to get into the weeds and to put ourselves in the shoes of Commerce. I understand that. Okay. So let's just jump forward then. I'll take the two issues separately. I still wouldn't buy products. So there's two competing sets of possible surrogate values at issue here. The import statistics, which is, again, what they used in the administrative process, and then what they ended up reverting to pursuant to the CIT's litigation. Okay? So they made certain decisions and made certain pronouncements in the administrative process that I believe they have never responded to appropriately at the CIT during the remand process there. They made the comment in the administrative process that this vitally rich price quote is not contemporaneous. They made the comment that this price quote does not represent a broad market average, and then they said, and this price quote is not publicly available. That was the first time? That was the first time in the administrative process. And then the second time they rely on it, and of course they spoke to it. They mentioned in the brief here or whatever why they think that their initial assessment was not the right one and what they're relying on here to get them by the effective use of that. Correct. What's wrong with what they've done? Because I believe that while they have tried to support, post-hack, tried to support their subsequent decision, I also believe that they tried to support their subsequent decision by various attacks on the data that they originally used, the import data, which are not accurate and which are not truthful and are not established on the record. Okay? So let me turn to why. In all honesty, I believe that their sudden change to the VitaRich price quote isn't because of any new love for the VitaRich price quote. It's because they all of a sudden decided that there are certain problems with the import data, and I don't believe the record supports their conclusions with respect to the problems with the import data, and that's where I think there's a problem. Okay? So first of all, with respect to the import data, the department said this in their remand. After reviewing the information on the record and considering the approach we have adopted in recent determinations in this and other aquaculture cases, we find that seafood byproducts are generally not internationally traded commodities and would be reflected in import statistics. So this is one of the reasons why they're saying you can't use, why we were wrong to use the import stats in the first place. Well, that statement that these byproducts are not internationally traded and therefore wouldn't appear in import statistics is simply not true and is contradicted by evidence on the record. My client, during the administrative process, submitted information to the department on its byproduct protectionism. Well, wait a minute. This comes out in the briefs. I mean, they didn't say it was never traded internationally. They said it was not generally traded internationally. Understood. But my client put out information on the record that some of its byproducts were traded. The fact that some of its byproducts were traded doesn't mean that these byproducts are generally traded internationally, right? Understood, but I don't understand. So I guess I don't understand the government's position. I don't understand what the point of that statement is then, that they're generally not inter-traded. They were using that to attack and say we can't use import statistics because they're generally not international traded. Well, if that's not true, then they can use import statistics for this. Right? No. Well, I don't answer the questions I ask. I apologize. I apologize. A rhetorical right, okay? So they're making a bold statement here, saying we can't use these import statistics because these kind of byproducts are not generally internationally traded. But that's not true, and the record doesn't support that. I believe that undercuts the government's argument. What's the main deficiency, in your view, is it by tariff? By tariff? By tariff? Price quote? The fact that, one, that it's a price quote, which means it's a price in a certain period of time. Right? It's one quote from one company that's used to value all of my clients' byproducts. Generally, the department's preference is to take a broad market average with surrogate values, generally if they can for the whole period of review, which would be a one-year period. You're right, if they can. But if they don't, this is the best evidence they have, then they're entitled to use it. Understood. But they also have import statistics, which the department has a state of preference to use import statistics when they can, because import statistics are from a broad market average, because the information is provided on a monthly basis, and it meets the rest of their requirements. That's why the department generally has a state of preference to use import statistics when they can. So what should they have done, in your view? What should they have done that was so significantly different that the result would have been significantly different? I believe that they should have stuck with their original decision from the administrative process and stuck with the import statistics. The other issue they have, and again, the department and the government has sorted this in their briefs, to your honors, about other reasons why they didn't want to use this import statistics. For example, they said that they believed that the use of these import statistics would distort the normal value calculation. Right, so that the value would be more than the value of a whole fish for waste products. Correct, and that's one of my points. I really do not understand the relevance or significance of that. Why fish skin can't cost more than a whole fish. This is not comparing fish skin, for example, to the finished product and saying, well, it's crazy to have a byproduct that's more than the finished product. But the whole fish is an input into the production process. To get fish skin from a whole fish, you've got to kill it, you've got to bleed it, you've got to skin it. Things have to be done to get to that fish skin. So this concept that it's crazy to use a value that is more than a whole fish, which is just a raw material, is non sequitur to me. They also said it has a higher value, so it distorts the normal value calculation. I don't know how a byproduct necessarily distorts the normal value calculation. I also don't understand why didn't this value distort the normal value when they used it in the final. So at the end of the day, I still believe, I submit, that the department's original decision to use import statistics to value these byproducts was the correct one. Why don't we save the remainder of your time? Sure. Thank you. Good morning, and may it please the court. Substantial evidence supports the trial court sustaining Commerce's determinations in the two issues before the court. First, on remand, the trial court properly upheld Commerce's selection of the Vita-Rich price quotes for the fish waste, broken meat, and fish... So what was the difference between the first and the second time? Between the initial determination and the remand results? Yes. The first time around, Commerce determined that the import statistics, that's what it would go with. And then when that determination was appealed to the CIT, the CIT actually specifically instructed Commerce to look at the Vita-Rich price quote. But you had already looked at it, right, and rejected it? Well, they looked at it, but more specifically to determine with the affidavit whether it was publicly available information. And even in the initial IDM, Commerce had actually said, as far back then, and this is on pages 3274 of the record, that we recognize that the Vita-Rich price quote may be more specific to fish waste. And so then when Commerce took a second look at this, which, as your Honor kind of indicated, they are permitted to do, they took a second glance at the Vita-Rich price quote and determined that it was better information for what they had on the record rather than the broader market statistics data. And an important missing factor in that broader market statistics data was that Commerce wasn't even really sure if the byproducts at issue here, so broken meat, fish skin, and the third, whether that was actually even in the market statistics data that they were citing from, which they were pulling from. And Commerce had found in the remand results, which is at pages 3647 of the record, that we find that valuing fish waste using import statistics results in fish waste surrogate value, which is higher than that of the whole fish. And it continues on that the Vita-Rich price quote satisfies our criteria of whether the surrogate value data is publicly available, includes terms of payment, and is tax and duty exclusive. And Commerce also recognized, so they continued, while a price quote from one company may not reflect a broad market average, this concern is outweighed by its far superior specificity and the fact that it meets the other SV selection criteria. And so Commerce did take a second look at the data and determined that what it had before it was this price quote that was actually Pangasius byproducts fish waste, whereas the import market statistics, they weren't even sure if the Pangasius fish and all these byproducts were included in there, and that this was just better information that they had on the record. Isn't it your view that we don't have to decide which time they were correct, but just determine whether in their second determination they had reasonable evidence? That is correct, whether Commerce's decision was reasonable. And they don't have to explain a change? Because ordinarily, when we're reviewing even deferentially, don't our cases say that if there's a change you have to explain the change itself? Well, here they did explain the change, and they did actually go through and address Vin Wan's arguments as to why the Vita-Rich price quote was still deficient. And as the trial court had specifically instructed it to look at the price quote, Commerce had continued that, because originally part of the issue was that Commerce had said that the price quote wasn't publicly available. But once Commerce took a second look at that affidavit, it determined that that affidavit accompanying the price quote actually explained that they were obtained as publicly available information that, again, pertains to the production and sales of Pangasius fish in the Philippines, which is the exact type of species we're looking at here, and that the affidavit also details the sales terms, the party offering the price, and the manner in which the price quote was obtained. The affidavit also states that the price quotes were requested on an ex-factory and tax-exclusive basis. And so it did go through, and this is at pages 36-71 of the record, Commerce did go through and specifically address everything that Vin Wan said was still wrong with this price quote, but determined at the end of the day that this was still the better information from which to base the surrogate value of the fish waste byproducts. And, again, the trial court found that, actually acknowledged, too, that Commerce found that there still were flaws in the price quotes, but had, again, determined that this was just the better information that was available on the record. And then turning to the second point, the trial court had correctly sustained Commerce's findings that the fine foods financial statement did, in fact, contain sufficient information to account for inventory changes, and this is because the changes in the inventory of fingerlings, which I understand to be the baby fish, which are sometimes also sold as finished goods, reflected the actual sale of fingerlings. And this was, again, when Commerce, in the remand results, determined that, again, Commerce is allowed to take a second look and determine if they made a mistake, and Commerce found here that, looking back at the financial statements, that when they, because they're obviously overwhelmed with work, they took a second look and found that, and this is on page 3652 of the record, that after further review, we find that the financial statements do, in fact, contain the detail necessary to account for changes in inventory. And it also found, and the court agreed, that Commerce's explanation was adequate and that Commerce had simply taken a second look at these financial statements and, with the accountants on staff that they have, which I am not, determined that they could actually trace the fingerlings through the changes in inventory and were able to make that calculation. Can I just ask you, I understand this is outside the record, but just for my own information, this was the sixth administrative review, and this happened in 2011, and it was based on years 2008, 2009, right? That is correct. Is anything, are we on a seventh administrative review now? I believe we're on the tenth administrative review now at this point. Okay. These take a while, I guess, to wind their way through the courts. But... One wonders why one would want to keep on looking at fish waste. You know, Your Honor, I'm subbing for someone, so I don't know why. But really what you have here is that Commerce had requested to take a second look at both of these two issues on remand, and then upon remand had determined that, at the end of the day, again, the Vita-Rich Price Quote was the better information by far. It was actually specific to Kangeasian fish waste to use, and that, moreover, that it could trace those changes in inventory with the fine foods financial statement. And if there are no other questions from the court, we would respectfully request that the court affirm the trial court's decision upholding Commerce's remand results in their entirety. Thank you. Thank you. Good morning. Lizak Nakaktar of Cassidy-Levy County, on behalf of the Catfish Farmers of America Plaintiff, FLB. I'm going to just briefly address some of the things that the court was addressing. What are we looking at here? This is about fish waste. We're looking at broad HDS categories that contain a lot of products that aren't specific to fish waste, and then we have a price quote that's very specific to the type of fish waste that's generated and sold by Vin Huan, the respondent. The court asked a little bit earlier about what are the fish waste used for. I think I heard the word delicacy. This is fish waste. What we're talking about is fish waste that's generated once the fish is cut up, picked up from the table or the factory floor, and just sold. This stuff spoils very quickly, so that's why Commerce decided it's not generally traded internationally. And this stuff is unfit for human consumption. Commerce has repeatedly determined in subsequent determinations based on record evidence before that this stuff is unfit for human consumption. So it's really not used as a delicacy. Procedurally, we talked about what has changed in Commerce's practice. Commerce just simply got it wrong. That's why we appealed to the Court of International Trade. Commerce does get things wrong, as the court pointed out. It gets things wrong routinely. When Commerce is issuing its prelim and final determinations, it's got tons of briefs, hundreds of pages of briefs by parties. A lot of legal issues. And these analysts are doing the best that they can of flipping through everything, trying to get it right, and sometimes they overlook evidence. Sometimes they misconstrue evidence and don't really consider it the way they should. Mistakes happen. That's why we appealed. And that's why Commerce took the opportunity to take a voluntary remand to really reevaluate its decision. And we believe, based on substantial, substantial record evidence, price codes specific to fish waste versus a broad HTS category, given Commerce's statutory mandate to calculate anti-dumping margins as accurately as possible and to use the best available information, Commerce reached the correct result. Then Juan has argued that it has exported, and the court talked about this earlier, that it's exported fish waste. The record shows, and we've said in our brief, that the fish waste that Vin Juan exported is frozen fish waste. That's why Commerce's determination that fish waste, and generally unfrozen fish waste, isn't internationally traded. As I mentioned, it spoils quickly, so there's no market for it. And generally, as to the point that there's no market for it, this is just not a fit for human consumption. This is, as a side note, this stuff generally goes into animal feed. And given the prices and costs of international shipping, and if you want to prevent the stuff from spoiling, you have to have refrigeration costs, this stuff isn't internationally traded. Benchmark prices, in fact, show that fish waste sells domestically for just pennies, and so it doesn't make sense to internationally trade this stuff. Record shows fish waste, fresh fish waste, isn't internationally traded. Based on Vin Juan's few select samples that it provided on the record, only Vin Juan trades its frozen fish waste internationally. A few last points about the HGS. Is there a distinction? We're talking about both frozen and unfrozen, right? We're talking about the valuation of fresh fish waste. So it does not include frozen? We're not talking about frozen, we're talking about fresh fish waste. And the price quote is specific to fresh fish waste. Problems with the HGS descriptions, in addition to the ones we talked about, it's not for fish waste at all. The descriptions say that it's for other fish meat, or marine fish, or flowers, meals, and pellets of fish or crustaceans. It's not covering fish waste at all. But even more probative of this issue, the countries that are exporting fish waste into the countries of the Philippines and Bangladesh that are at issue, these aren't Pangaeus-producing countries. So the circuit values isn't even, whatever the fish products are in getting exported, they're not inclusive of Pangaeus fish waste. And the values are two times the price of the whole fish input. When this stuff is just generated from cutting, picked up from the table, picked up from the factory floor, nothing else is being done to it, just common sense dictates that it cannot, it should not be valued 2.5 times higher than the price of the whole fish input. Since I'm out of time, I'm going to take my leave. Thank you. Got some time left on rebuttal. So I'm a little unsure of how to handle this. I think maybe I'll talk a little bit of rebuttal on fish waste, with your permission, then I'll finish up the last little bit of my direct there. Just respect to fish waste here, it's not just fish waste, which the department valued and which is under litigation here. There was fish waste, there was also broken meat, right, which is more valuable, and fish skin, just to clarify the record. Also, just remember, when the department, when we talk about specificity, when the department and the administrative process looked at those import statistics, they deemed them to be specific. So the arguments about which is more specific, the court may want to get into that, but both have been deemed by the agency at some point in this proceeding to be specific. Also, with respect, let's talk a little bit now, back to some of my direct here, which goes to this issue, which is actually, in all honesty, more important to my client in this case, this issue of the financial statements. So the government today actually made a couple times, saying, well, the government took, or the department took a second look at the financial statement, and then decided it could make the inventory changes. With all due respect, it wasn't the second look. It was like the fourth. In the final administrative decision, the department used fine foods. That's not under, that's not being challenged here. And they didn't make any changes due to inventory movements. Petitioners filed a ministerial errors allegation, and said to the department, hey, with your financial statements, you unintentionally didn't make changes for inventory movement. You should have done that, because that's your course. The department responded back to the ministerial errors allegation, and this is what they said with respect to my clients, the financial statement used for my client, fine foods. We find petitioners' allegations are methodological in nature, and not ministerial. The treatment of changes in inventory is done on a case-by-case basis, and fine foods financial statements lack sufficient detail to determine the proper treatment of changes in inventory. Thus, the department intentionally excluded any change in inventory from the racial calculations. So that was the second time they looked at it in the final. They looked at it in the ministerial errors allegation. When we were in front of the CIT, when the government filed its response briefs, it continued to deport and say, listen, we've looked at these fine foods financial statements. We can't make the inventory changes because there's not enough detail in these financial statements. So that was like the third time. Issues get remanded back from the CIT, back to the department. The department issues a draft remand. In that draft remand, they continued to assert, we can't make these changes to the fine food financial statements because there's not enough detail. Both petitioners and I were allowed to submit comments per the normal course to the department. When the department then issued its final remand to the court, all of a sudden they changed it. So they've had like four looks at this thing. I disagree. And this is in the weeds a bit, right? You have to look at that financial statement. The department all of a sudden said, wait a minute, we can make these changes because of fingerlings. We can trace that fingerlings are being sold as a finished good. Therefore, they are part of the finished goods inventory movement, and there we can make the change. They do that. The surrogate financial ratio goes up for my client to over 65%. A number that has never been seen before or since in this case. The non-integrated financial ratio, it's 6%. So there's a factual misunderstanding or a factual distinction here. Those fingerlings, this company, and the reason they use fine foods against my client and my client only is because my client is integrated. Integrated fish company means they buy these baby fingerlings, they put them in ponds, they feed them, they grow them into whole fish. Then they process these whole fish or sell the whole fish. So those fingerlings are a input to the production process. They may sell some, possibly, but to deem that all of those fingerlings were part of the finished goods and part of finished goods inventory, they were all to be sold, the record simply does not support that. Thank you. Thank you. We thank all parties and cases submitted.